Dorothy ENRIGHT, as Special Administrator of the Estate of Heath Enright, Heath Enright, Renee Enright, Joseph Enright and Joseph Enright, Jr., Plaintiffs-Appellants-Petitioners,†

v.

BOARD OF SCHOOL DIRECTORS OF THE CITY OF MILWAUKEE; Diane Clark and Wausau Insurance Companies, Defendants-Respondents,

Peggy KENNER, President; Dr. Lee F. McMurrin, Superintendent; and Mr. John J. Peterburs, Secretary Business Manager, Defendants.

Supreme Court

*No. 82–2158. Argued March 28, 1984.—Decided April 24, 1984.*

(Also reported in 346 N.W.2d 771.)

† Motion for reconsideration denied, with costs, June 5, 1984.

For the plaintiffs-appellants-petitioners there were briefs by *Robert C. Angermeier* and *Angermeier & Rogers,* Milwaukee, and oral argument by *Robert C. Angermeier.*

For the defendants-respondents there was a brief by *C. Donald Straub,* Milwaukee, and oral argument by *Mr. Straub.*

Amicus curiae brief was filed by *William H. Lynch,* Milwaukee, for the Wisconsin Civil Liberties Union Foundation, Inc.

STEINMETZ, J.  The issue in this case is whether negligence on the part of an employee of the Board of School Directors of the City of Milwaukee gives rise to a 42 U.S.C. sec. 1983 action for the death of a child attending a Milwaukee public school.  There are other issues related to the negligence issue and they will be discussed in the opinion.

This case involves a civil action which alleges common law negligence and deprivation of civil rights.  In response to the third amended complaint, the defendants filed a motion to dismiss both the state negligence action and the federal civil rights action.  The trial court, the Milwaukee county circuit court, Honorable Laurence C. Gram, Jr., issued an oral decision on August 30, 1982, dismissing the common law negligence action on public policy grounds.  On October 22, 1982, the trial court issued a memorandum decision dismissing the federal civil rights claim.  The plaintiffs appealed both decisions.

The court of appeals, in a published decision, reinstated the common law negligence action, but upheld the

dismissal of the civil rights action. *Enright v. Milwaukee Sch. Directors Bd.,* 114 Wis. 2d 124, 338 N.W.2d 114 (Ct. App. 1983). The defendants have not cross-petitioned for review of the reinstatement of the common law negligence action.

The facts describe a tragic death of a seven year old boy. Virginia Burgardt lives across the street from the Hampton Elementary School in the city of Milwaukee. On September 14, 1979, at approximately 10:00 a.m., she observed a white male in his early twenties, later identified as Thomas White, standing near the playground at the Hampton School watching children who were playing during recess. The white male continued to watch the children at recess and repeatedly looked around, apparently to determine if anyone was watching him.

At approximately 11:00 a.m. the same day, Cynthia Winquist was at the Hampton Elementary School "totlot" with her two year old son. She observed the adult white male watching the other children who were at recess on the playground at the time. Cynthia Winquist became suspicious of the man and later told the police that at the time the man was observing the children on the playground he appeared to be "snickering" to himself. After the children returned to the school, leaving Cynthia Winquist and her young child alone, she became increasingly concerned about her own safety as the yet unidentified white male began staring at her and continued to "snicker." Cynthia Winquist observed an electrical cord hanging out of the adult white male's trouser pocket. Upon seeing this she grabbed her child and left the tot-lot.

Virginia Burgardt observed the episode between Cynthia Winquist, her child, and the unidentified adult white male. She then telephoned the principal's office at the Hampton Elementary School. The telephone was answered by the secretary on duty, Diane Clark. Virginia Burgardt advised the secretary of the man outside the

school near the playground acting in a suspicious and unusual manner. Diane Clark told Virginia Burgardt that she would inform the principal, Mr. Dakich. Mrs. Burgardt returned to her front porch, watching the individual. The man stayed around the school area for a period of time.

Another neighbor, Nathlyn Voegtline, also observed the unidentified adult white male leaning on the playground fence gazing into the playground area at a time when there were no children on the playground. This was approximately 11:30 a.m. Both Mrs. Burgardt and Mrs. Voegtline commented to one another about the man's presence after Mrs. Burgardt had telephoned the principal's office.

Diane Clark, the school secretary, acknowledged receiving the phone call from Mrs. Burgardt. She later told her supervisor that she had taken the message but "set it aside" and it "completely slipped her mind." Just after lunch, Diane Clark learned that a student had been killed or injured near the school. On receiving this information she tied the earlier phone call from the neighbor to the death or injury. It was at this time that she brought the phone call to the principal's attention.

On September 14, 1979, Heath Enright was a second grader at the Hampton Elementary School. He left the school at 12:00 p.m. that day to go home for lunch. At approximately 1:00, Robert Miller and his wife were driving west on Fairmont Avenue approximately one block from the Hampton Elementary School. They observed a young child lying on the grass between the sidewalk and the curb. Mr. Miller went to assist and found the lifeless body of Heath Enright. Robert Miller confronted an adult white male standing nearby in connection with the discovery of Heath Enright's body. The adult white male, later identified as Thomas White, admitted to the Millers that he had strangled Heath Enright with a piece of wire and that he had taken the

wire back to his home and returned to the scene. After the police arrived, White took police officers to the basement of his house and identified a black electrical wire on the floor as the one used to strangle Heath Enright.

At the time of Heath Enright's death, Captain Robert Proulx was the captain of the fourth district of the Milwaukee Police Department, the district in which the Hampton Elementary School is located. In the record there is an affidavit of Attorney Robert Angermeier, the plaintiffs' attorney, which sets forth what Captain Proulx allegedly would have stated at trial. Captain Proulx allegedly would have testified that complaints regarding strangers on or near the schoolgrounds in his district are always received with high priority. Captain Proulx would have further testified that had the fourth district received the complaint regarding this suspicious person on or near the Hampton School grounds, officers would have responded and questioned the person in order to determine whether he had any legitimate business at or near the school. The officers normally would have checked at the school throughout the day in order to determine whether the suspicious person had returned to the area surrounding the school. Further, he would have testified that the responding officers would have had the option to arrest White for the violation of a city of Milwaukee loitering ordinance which specifically prohibits loitering near or on school grounds, Ordinance 106–31(d) which forbids the following conduct:

"Loiterers in or about any school or public place at or near which children or students attend or normally congregate. As used in this subsection 'loiter' means to delay, to linger, or to idle in or about any said school or public place without a lawful purpose for being present."

Additionally, Captain Proulx would have testified that had circumstances warranted, the investigating officers

would have been authorized to take White into custody for psychiatric evaluation. *See* sec. 51.15(1), Stats.[1]

[1] Sec. 51.15, Stats., provides:

"**51.15 Emergency detention.** (1) BASIS FOR DETENTION. (a) A law enforcement officer or other person authorized to take a child into custody under ch. 48 may take an individual into custody if the officer or person has cause to believe that such individual is mentally ill, drug dependent or developmentally disabled, and that the individual evidences:

"1. A substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm;

"2. A substantial probability of physical harm to other persons as manifested by evidence of recent homicidal or other violent behavior on his or her part, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm on his or her part;

"3. A substantial probability of physical impairment or injury to himself or herself due to impaired judgment, as manifested by evidence of a recent act or omission. The probability of physical impairment or injury is not substantial under this subdivision if reasonable provision for the individual's protection is available in the community or, in the case of a minor, if the individual is appropriate for services or placement under s. 48.13(4) or (11);

"4. Behavior manifested by a recent act or omission that, due to mental illness or drug dependency, he or she is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation or serious physical disease will imminently ensue unless the individual receives prompt and adequate treatment for this mental illness or drug dependency. No substantial probability of harm under this subdivision exists if reasonable provision for the individual's treatment and protection is available in the community, if the individual can receive protective placement under s. 55.06, or, in the case of a minor, if the individual is appropriate for services or placement under s. 48.13 (4) or (11). The individual's status as a minor does not automatically establish a substantial probability of death, serious physical injury, serious physical debilitation or serious disease under this subdivision.

Heath Enright was survived by his twin sister, Renee Enright, his brother, Joseph Enright, and his parents, Joseph Enright and Dorothy Enright. An action was commenced on behalf of the estate and the surviving family. Count I of the complaint alleges a wrongful death action under state law, sec. 895.04, Stats.[2] Count II alleges a civil rights violation wherein Renee Enright, Joseph Enright, and Heath's parents allege that they were deprived of the love and companionship of their brother and child due to the unjustified and arbitrary conduct of a government agency.

The court of appeals concluded that because Wisconsin's tort remedy provided a "satisfactory means of redress," the Enrights did not suffer a deprivation without due process in connection with the death of Heath Enright. The court of appeals relied on *Parratt v. Taylor*, 451 U.S. 527 (1981), in rejecting the Enrights' sec. 1983 claim. The *Parratt* case dealt with procedural due process and not substantive due process; however, the majority did not make the distinction in its holding.

Plaintiffs rely on 42 U.S.C. sec. 1983 which provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State of Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

---

"(b) The officer's or person's belief shall be based on a specific recent overt act, attempt or threat to act or omission made by the individual and observed by or reliably reported to the officer or person."

[2] Sec. 895.04(1), Stats., provides:

"895.04 **Plaintiff in wrongful death action.** (1) An action for wrongful death may be brought by the personal representative of the deceased person or by the person to whom the amount recovered belongs."

As we held in *Terry v. Kolski,* 78 Wis. 2d 475, 486, 254 N.W.2d 704 (1977):

"We are satisfied that the provision of the federal law now appearing in the United States Code as 42 U.S.C. sec. 1983 is Revised Statute sec. 1979, affirmatively enacted by the codification of 1874. The statute now codified as 42 U.S.C. sec. 1983 indeed had its origin in the laws of the United States as a portion of the Civil Rights Act passed on April 9, 1866, as 14 Stats. 27."

Current consideration of sec. 1983 has its genesis in *Monroe v. Pape,* 365 U.S. 167 (1961). *Monroe* involved a search of a Chicago premises by Chicago police without a search warrant. The city of Chicago moved to dismiss the complaint on the ground that it was not liable under the Civil Rights Acts. That motion to dismiss was granted and the ruling was affirmed by the United States Supreme Court by the following language: "For we are of the opinion that Congress did not undertake to bring municipal corporations within the ambit of sec. 1979." *Id.* at 187. The opinion in *Monroe* was written by Justice William O. Douglas. There is dicta in *Monroe* which frequently has been considered by the courts of the United States and the issues created therein still are not totally resolved by the United States Supreme Court. In some instances the final resolution of those issues has been avoided by that Court. The first dicta of *Monroe* dealt with available state relief. The Court stated: "It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." *Id.* at 183.

In *Monroe,* the Court affirmed its definition of "under color of law" that it had decided in *United States v. Classic,* 313 U.S. 299 (1941), *Screws v. United States,* 325 U.S. 91 (1945) and *Williams v. United States,* 341 U.S. 97 (1951). That definition "of under color" of

state law was stated in *Monroe* as follows: " 'Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action "under color of" state law.' " 365 U.S. at 184. Those who reason that more than negligence is required for a sec. 1983 action look to this language for support of their position. The recitation of "misuse of power" is not consistent with merely a negligent act.

While referring to the *Screws* facts and the *Monroe* facts, the court in *Monroe* added the following dicta:

"In the *Screws* case we dealt with a statute that imposed criminal penalties for acts 'wilfully' done. We construed that word in its setting to mean the doing of an act with 'a specific intent to deprive a person of a federal right.' 325 U.S., at 103. We do not think that gloss should be placed on sec. 1979 which we have here. The word 'wilfully' does not appear in sec. 1979. Moreover, sec. 1979 provides a civil remedy, while in the *Screws* case we dealt with a criminal law challenged on the ground of vagueness. Section 1979 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Id.* at 187.

Since that dicta, the Court has several times considered the issue of whether negligent acts alone by governmental agents are enough to allow a cause of action for deprivation of constitutional rights under sec. 1983. The final resolution of the negligence issue as a basis for sec. 1983 actions is for the United States Supreme Court since sec. 1983 is federal tort law and that Court must determine whether intentional or unintentional conduct by governmental personnel is necessary for a violation of sec. 1983. Proper tort liability actions under sec. 1983 may be brought in Wisconsin state courts since the decision in *Terry v. Kolski,* 78 Wis. 2d at 496–97.

*Monroe* was decided in 1961 and its rule that governmental units were not liable in sec. 1983 actions lasted until 1978 when it was rejected in the case of *Monell v.*

*New York City Dept. of Social Services,* 436 U.S. 658, 663 (1978), where the Court held:

"[W]e indicated in *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 279 (1977), last Term that the question presented here was open and would be decided 'another day.' That other day has come and we now overrule *Monroe v. Pape, supra,* insofar as it holds that local governments are wholly immune from suit under sec. 1983."

The holding of *Monell* is at 690–91 where *Monroe* was selectively overruled but the language also was informative that negligence alone was not sufficient to hold governments liable under sec. 1983. It reads as follows:

"Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom sec. 1983 applies. Local governing bodies, therefore, can be sued directly under sec. 1983 for monetary, declaratory, or injunctive relief *where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.* Moreover, although the touchstone of the sec. 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other sec. 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations *visited pursuant to governmental 'custom'* even though such a custom has not received formal approval through the body's official decisionmaking channels. As Mr. Justice Harlan, writing for the Court, said in *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–168 (1970) : 'Congress included customs and usages [in sec. 1983] because of the persistent and widespread discriminatory practices of state officials . . . . Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a "custom or usage" with the force of law.'

"On the other hand, the language of sec. 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable *unless action pursuant to official municipal policy of some nature* caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under sec. 1983 on a *respondeat superior* theory." (Emphasis added.)

The Court concluded as follows:

"We conclude, therefore, that a local government may not be sued under sec. 1983 for an injury inflicted solely by its employees or agents. Instead, *it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under sec. 1983.* Since this case unquestionably involves official policy as the moving force of the constitutional violation found by the District Court, see *supra*, at 660–662, and n. 2, we must reverse the judgment below. In so doing, we have no occasion to address, and do not address, what the full contours of municipal liability under sec. 1983 may be. We have attempted only to sketch so much of the sec. 1983 cause of action against a local government as is apparent from the history of the 1871 Act and our prior cases, and we expressly leave further development of this action to another day." *Id.* at 694–95. (Emphasis added.)

The foregoing language of *Monell* is not consistent with holding governmental corporations liable under sec. 1983 for negligent acts of employees.

*Martinez v. California,* 444 U.S. 277 (1980), involved a suit under sec. 1983 for the death of a 15 year old girl caused by a parolee. The court acknowledged the parole authorities were fully informed about the murderer's history of mental disorder and his previous commitment to a state mental hospital with a recommendation that he not be paroled, but nevertheless, he was paroled five

years later. The parole authorities knew of his propensities and the likelihood that he would commit another violent crime. Five months after his release he tortured and killed the appellants' child. The Court stated: "We assume, as the complaint alleges, that appellees knew, or should have known, that the release of Thomas created a clear and present danger that such an incident would occur. *Their action is characterized not only as negligent, but also as reckless, willful, wanton and malicious." Id.* at 280. (Emphasis added.) Still, the Court upheld a California statute giving immunity to parole officials and held:

"But even if one characterizes the immunity defense as a statutory deprivation, it would remain true that the State's interest in fashioning its own rules of tort law is paramount to any discernible federal interest, except perhaps an interest in protecting the individual citizen from state action that is wholly arbitrary or irrational." *Id.* at 282.

The parole board had not even followed certain "requisite formalities" in its release of Thomas. In spite of this conduct of the parole board, alleged to have been not merely negligent but reckless, the court upheld the immunity statute as having "a rational relationship between the state's purposes and the statute." *Id.* at 282.

In *Martinez* the Court stated: "Although a sec. 1983 claim has been described as 'a species of tort liability,' *Imbler v. Pachtman,* 424 U.S. 409, 417, it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute." 444 U.S. at 285.

The Court explained that the girl's death was too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law. In *Martinez,* a new aberrant ingredient of analyzing sec. 1983 actions appeared and that was one of remoteness of result from the state officers' actions which sounds

like a public policy basis of decision as distinguished from the other issues of a sec. 1983 action. Significantly, the court cited *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928), a landmark case regarding tort law.

*Parratt v. Taylor,* 451 U.S. 527, involved an inmate at the Nebraska Penal and Correctional Complex who ordered by mail certain hobby materials valued at $23.50. The hobby materials were lost and the inmate brought suit under 42 U.S.C. sec. 1983 to recover their value. The inmate claimed his property was negligently lost by prison officials in violation of his rights under the fourteenth amendment to the Constitution. More specifically, he claimed that he had been deprived of property without due process of law. The district court ruled that negligent actions by state officials can be a basis for an action under 42 U.S.C. sec. 1983. The Supreme Court stated:

"While we have twice granted certiorari in cases to decide whether mere negligence will support a claim for relief under sec. 1983, see *Procunier v. Navarette,* 434 U.S. 555 (1978), and *Baker v. McCollan,* 443 U.S. 137 (1979), we have in each of those cases found it unnecessary to decide the issue. . . .

"These two decisions, however, have not aided the various Courts of Appeals and District Courts in their struggle to determine the correct manner in which to analyze claims such as the present one which allege facts that are commonly thought to state a claim for a common-law tort normally dealt with by state courts, but instead are couched in terms of a constitutional deprivation and relief is sought under sec. 1983. The diversity in approaches is legion. See, *e.g., Williams v. Kelley,* 624 F.2d 695 (CA5 1980); *Beard v. Mitchell,* 604 F.2d 485 (CA7 1979); *Fulton Market Cold Storage Co. v. Cullerton,* 582 F.2d 1071 (CA7 1978); *O'Grady v. Montpelier,* 573 F.2d 747 (CA2 1978); *Bonner v. Coughlin,* 517 F.2d 1311 (CA7 1975), modified en banc, 545 F.2d 565 (1976); *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077

(CA3 1976) ; *Jones v. Marshall*, 528 F.2d 132 (CA2 1975) ; *Diamond v. Thompson*, 523 F.2d 1201 (CA5 1975) ; *Kimbrough v. O'Neil*, 523 F.2d 1057 (CA7 1975) ; *Carter v. Estelle*, 519 F.2d 1136 (CA5 1975) ; *Pitts v. Griffin*, 518 F.2d 72 (CA8 1975) ; *Russell v. Bodner*, 489 F.2d 280 (CA3 1973) ; *Johnson v. Glick*, 481 F.2d 1028 (CA2 1973) ; *McCray v. Maryland*, 456 F.2d 1 (CA4 1972) ; *Carter v. Carlson*, 144 U.S. App. D.C. 388, 447 F.2d 358 (1971) ; *Madison v. Manter*, 441 F.2d 537 (CA1 1971) ; *Howard v. Swenson*, 426 F.2d 277 (CA8 1970) ; *Whirl v. Kern*, 407 F.2d 781 (CA5 1968) ; and *Striker v. Pancher*, 317 F.2d 780 (CA6 1963). We, therefore, once more put our shoulder to the wheel hoping to be of greater assistance to courts confronting such a fact situation than it appears we have been in the past.

"Nothing in the language of a sec. 1983 or its legislative history limits the statute solely to intentional deprivations of constitutional rights. In *Baker v. McCollan, supra,* we suggested that simply because a wrong was negligently as opposed to intentionally committed did not foreclose the possibility that such action could be brought under sec. 1983. We explained :

" '[T]he question whether an allegation of simple negligence is sufficient to state a cause of action under sec. 1983 is more elusive than it appear at first blush. It may well not be susceptible of a uniform answer across the entire spectrum of conceivable constitutional violations which might be the subject of a sec. 1983 action.' 443 U.S., at 139–40.

"Section 1983, unlike its criminal counterpart, 18 U.S.C. sec. 242, has never been found by this Court to contain a state-of-mind requirement. The Court recognized as much in *Monroe v. Pape*, 365 U.S. 167 (1961), when we explained after extensively reviewing the legislative history of sec. 1983, that

" '[i]t is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges and immunities guaranteed by the Four-

teenth Amendment might be denied by state agencies.'
*Id.*, at 180.

"In distinguishing the criminal counterpart which had earlier been at issue in *Screws v. United States,* 325 U.S. 91 (1945), the *Monroe* Court stated:

" 'In the *Screws* case we dealt with a statute that imposed criminal penalties for acts "willfully" done. We construed that word in its setting to mean the doing of an act with "a specific intent to deprive a person of a federal right." 325 U.S., at 103. We do not think that gloss should be put on [sec. 1983] which we have here. The word "willfully" does not appear in [sec. 1983]. Moreover, [sec. 1983] provides a civil remedy, while in the *Screws* case we dealt with a criminal law challenged on the grounds of vagueness. *[Section 1983] should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'* 365 U.S., at 187.

"Both *Baker v. McCollan* and *Monroe v. Pape* suggest that sec. 1983 affords a 'civil remedy' for deprivations of federally protected rights caused by persons acting under color of state law without any express requirement of a particular state of mind. Accordingly, in any sec. 1983 action the initial inquiry must focus on whether the two essential elements to a sec. 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." 451 U.S. at 532–33. (Emphasis added.)

*Parratt* dealt with the state negligently taking the inmate's property. The Court went on to state:

"Unquestionably, respondent's claim satisfies three prerequisites of a valid due process claim: the petitioners acted under color of state law; the hobby kit falls within the definition of property; and the alleged loss, *even though negligently caused,* amounted to a deprivation. Standing alone, however, these three elements do not establish a violation of the Fourteenth Amendment. *Nothing in that Amendment protects against all depriva-*

*tions of life, liberty, or property by the State. The Four-teenth Amendment protects only against deprivations 'without due process of law.' Baker v. McCollan,* 443 U.S., at 145. Our inquiry therefore must focus on whether the respondent has suffered a deprivation of property without due process of law. In particular, we must decide whether the tort remedies which the State of Nebraska provides as a means of redress for property deprivations satisfy the requirements of procedural due process." *Id.* at 536–37. (Emphasis added.)

The Court concluded:

"Application of the principles recited above to this case leads us to conclude the respondent has not alleged a violation of the Due Process Clause of the Fourteenth Amendment. Although he has been deprived of property under color of state law, *the deprivation did not occur as a result of some established state procedure.*" *Id.* at 543. (Emphasis added.)

The *Parratt* majority rejected the argument that the state did not adequately protect the inmate's interests because the procedural method of redress provides only for an action against the state as opposed to its individual employees. It contains no provisions for punitive damages, and there is no right to a trial by jury. Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under sec. 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process. *Parratt,* 451 U.S. at 544. The remedies provided could have fully compensated the respondent for the property loss he had suffered, and the Court held that they are sufficient to satisfy the requirements of due process.

To say the least, *Parratt* is confusing. The majority does state negligence may be enough for a sec. 1983 action and yet it found the prison authorities, even though they violated prison rules regarding the prisoner's prop-

erty, which seems to be negligence, had not violated due process since the state provided an alternative remedy which was sufficient to satisfy due process requirements, even though that remedy would only repay the prisoner for the value of his hobby materials. Also, the state action of deprivation did not occur as a result of some established procedure.

The Court went on to state that even though negligent action by the government qualifies as a 1983 action, the Court will still look to whether a state remedy satisfies due process. The Court stated:

"Our decision today is fully consistent with our prior cases. To accept respondent's argument that the conduct of the state officials in this case constituted a violation of the Fourteenth Amendment would almost necessarily result in turning every alleged injury which may have been inflicted by a state official acting under 'color of law' into a violation of the Fourteenth Amendment cognizable under sec. 1983. It is hard to perceive any logical stopping place to such a line of reasoning. Presumably, under this rationale any party who is involved in nothing more than an automobile accident with a state official could allege a constitutional violation under sec. 1983. Such reasoning 'would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States.' *Paul v. Davis*, 424 U.S. 693, 701 (1976). We do not think that the drafters of the Fourteenth Amendment intended the Amendment to play such a role in our society." *Id.* at 544.

The result of *Parratt* was to reverse the district court and dismiss the sec. 1983 action. The rationale of *Parratt* is confusing, which is obvious from a concurring opinion written by Justice Blackmun and joined by Justice White, a concurring opinion written by Justice Powell and a concurring opinion in part and dissenting in part written by Justice Marshall.

Justice Blackmun and Justice White limited the majority opinion to property values and rights only and

said: "I do not read the Court's opinion as applicable to a case concerning deprivation of life or liberty." *Id.* at 545. The majority did not apply a limit in its opinion to property value and rights only.

Justice Powell wrote: "Unlike the Court, I do not believe that such negligent acts by state officials constitute a deprivation of property within the meaning of the Fourteenth Amendment, regardless of whatever subsequent procedure a State may or may not provide. I therefore concur only in the result." *Id.* at 546. In his analysis Justice Powell wrote:

"First, the Court passes over a threshold question— whether a negligent act by a state official that results in loss of or damage to property constitutes a deprivation of property for due process purposes. . . .

"The central question in this case is whether *unintentional* but negligent acts by state officials, causing respondent's loss of property, are actionable under the Due Process Clause. In my view, this question requires the Court to determine whether intent is an essential element of a due process claim, just as we have done in cases applying the Equal Protection Clause and the Eighth Amendment's prohibition of 'cruel and unusual punishment.' The intent question cannot be given 'a uniform answer across the entire spectrum of conceivable constitutional violations which might be the subject of a sec. 1983 action,' *Baker v. McCollan,* 443 U.S. 137, 139–40 (1979). Rather, we must give close attention to the nature of the particular constitutional violation asserted, in determining whether intent is a necessary element of such a violation.

". . . .

"A 'deprivation' connotes an intentional act denying something to someone, or, at the very least, a deliberate decision not to act to prevent a loss. The most reasonable interpretation of the Fourteenth Amendment would limit due process claims to such active deprivations. This is the view adopted by an overwhelming number of lower courts, which have rejected due process claims premised on negligent acts without inquiring into the existence or sufficiency of the subsequent procedures provided by the States. In addition, such a rule would avoid trivializ-

ing the right of action provided in sec. 1983. That provision was enacted to deter real *abuses* by state officials in the exercise of governmental powers. *It would make no sense to open the federal courts to lawsuits where there has been no affirmative abuse of power, merely a negligent deed by one who happens to be acting under color of state law." Id.* at 547–49. (Emphasis added.)

Justice Powell interpreted the majority's opinion as not concerned with whether negligent acts supply the right of action under sec. 1983 since in the majority's view such remedies as provided by the states for negligent acts would satisfy procedural due process and relegate cases of official negligence to non-federal forums. He would have adopted "the view that negligent official acts do not provide any basis for inquiries by federal courts into the existence, or procedural adequacy, of applicable state tort remedies." *Id.* at 551–52. This is not the majority view.

Justice Marshall stated: "I join the opinion of the Court insofar as it holds that negligent conduct by persons acting under color of state law may be actionable under 42 U.S.C. sec. 1983." *Id.* at 554–55. He agreed further as follows: "I also agree with the majority that in cases involving claims of *negligent* deprivation of property without due process of law, the availability of an adequate postdeprivation cause of action for damages under state law may preclude a finding of a violation of the Fourteenth Amendment." *Id.* at 555.

Justice Marshall would have found there was not an adequate state law remedy available to the inmate in this case. He would have required the state prison officials to inform the prisoner who claimed he was aggrieved by official action about remedies available under state law. Since they did not advise the prisoner accordingly, he would have affirmed the court of appeals. *Id.* at 556.

The concurring justices agreed with the result of Justice Rehnquist's majority opinion but were unable to persuade the majority that their beliefs as to the law should be stated in the reasoning of the Court. Therefore, the holding of *Parratt* is not restricted to property right denials and negligent conduct by officials can serve as a basis for a sec. 1983 claim; however, if the local unit of government or state has provided a tort remedy as a means of redress for the deprivation of constitutional rights, that "satisfies the requirements of procedural due process." Also, the result of the action of governmental officials might not be a deprivation caused by the official. *Martinez,* 444 U.S. at 285.

As the Wisconsin court of appeals stated in its decision in this case:

"What redress or remedy the courts can provide to the parents of a murdered child for their loss can be but a paltry shadow of what was actually lost. Courts can neither restore the lost life nor order the clock to move back to a happier time. No one could challenge that the Enrights have suffered a grievous loss. Yet, the only remedy, poor as it may be, afforded under law is money damages. As such, the remedy afforded under state law is no more nor less adequate as recompense for loss than that afforded under sec. 1983. The Enrights have a common law negligence claim, a claim that we herein reinstate. Due process is therefore not denied them." 114 Wis. 2d at 129.

The common law negligence claim referred to by the court of appeals is not further identified but references must have been to the statutory remedy of sec. 895.04, Stats., the wrongful death action.

If the United States Supreme Court truly had been interested in clarifying the law for other courts, it would have been more direct not to allow mere negligence as a ground for a sec. 1983 action. Instead, in negligence

pleadings for a sec. 1983 action, courts must now determine whether any governmental unit provides redress that satisfies the requirements of procedural due process. The Court in *Parratt* did not distinguish between substantive due process and procedural due process injuries.

The plaintiffs argue that they should be able to bring a sec. 1983 action since the limit of damages under the Wisconsin remedy is restricted as follows:

(1) To a limit of $25,000 for loss of society and companionship under sec. 895.04 (4), Stats.[3]

(2) A negligence action will not recognize the claims of the brothers and sisters for their loss of Heath.

(3) Due to the facts of the case, the parents' damages can be no greater than that provided for loss of society and companionship of Heath.

The United States Supreme Court ruled in *Parratt* that although the state remedies may not provide all the relief which may have been available if the party could have proceeded under sec. 1983, this does not mean that the state remedies are inadequate to satisfy the requirements of due process. *Parratt*, 415 U.S. at 544.

The plaintiffs argue that they are entitled to damages as a result of Heath's death for the deprivation of constitutional rights, since the parent-child relationship is protected by the constitution and its deprivation may be redressed under sec. 1983 and also the existence of a constitutionally protected associational interest between siblings. We decline to decide those issues, since the dis-

---

[3] Sec. 895.04(4), Stats., provides:

"(4) Judgment for damages for pecuniary injury from wrongful death may be awarded to any person entitled to bring a wrongful death action. Additional damages not to exceed $25,000 for loss of society and companionship may be awarded to the spouse or unemancipated or dependent children, or parents of the deceased."

positive issue of the due process claim is satisfied by the remedy available for redress in Wisconsin, and, therefore, a disposition of the other issues in this case is not necessary and only would be advisory.

*By the Court.*—The decision of the court of appeals is affirmed.